# 12-3757

---------◆--------

JOEL J. CABALA,

*Plaintiff-Appellee,*

v.

TIMOTHY W. CROWLEY, KIM A. MORRIS,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT OF
CONNECTICUT (NEW HAVEN)

## APPELLANT'S BRIEF

LAW OFFICES OF DAVID W. RUBIN
ANDREW J. SOLTES, JR.
*Attorney for Defendants-Appellants*
600 Summer Street, Suite 201
Stamford, CT 06901
(203) 353-1404
*ajsoltes@dwr-law.com*

DICK BAILEY SERVICE   (212) 608-7666  (718) 522-4363  (516) 222-2470  (914) 682-0848  Fax: (718) 522-4024
1-800-531-2028

## TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………………………..........…iv

JURISDICTIONAL STATEMENT……………………………………….........1

STATEMENT ISSUES PRESENTED FOR REVIEW…………………….....1, 2

STATEMENT OF THE CASE………………………………………………..…2

STATEMENT OF FACTS……………………………………………………6

STANDARD OF REVIEW……………………………………………….…28

SUMMARY OF THE ARGUMENT…………………………………….....31

ARGUMENT………………………………….……………………………..33

    POINT I:

    THE DISTRICT COURT ERRED IN HOLDING THAT THE
    SUBJECT ATTORNEY'S FEES WERE "REASONABLE",
    AS THE PLAINTIFF'S CONTINUED PROSECUTION OF
    THIS ACTION SUBSEQUENT TO BEING OFFERED FULL
    STATUTORY DAMAGES AND A COURT HEARING TO
    DETERMINE ATTORNEY'S FEES RENDERS ALL ATTORNEY'S
    FEES SUBSEQUENTLY INCURRED UNREASONABLE AS A
    MATTER OF LAW. ……………………………………………………33

    POINT II:

    THE DISTRICT COURT ERRED IN GRANTING PLAINTIFF'S
    APPLICATION FOR ATTORNEY'S FEES UNDER
    CIRCUMSTANCES WHERE THE FEES WERE NOT
    "REASONABLE" BASED ON PLAINTIFF'S COUNSEL'S
    TACTICS AND CONDUCT IN THE PROSECUTION OF
    THIS FEE-SHIFTING CASE...……………………………….....…..…43

A.  Faulkner was never retained by Cabala to represent his interests in the FDCPA matter; Faulkner did not have direct authority  from, or an agreement with Plaintiff to act on his behalf under specific terms of representation, including the payment and collection of fees; Faulkner never communicated directly with Plaintiff and, in fact, was contractually prohibited from contacting Plaintiff by agreement with another attorney…………………..………43

B.  None of the settlement offers made by Defendant to Cabala were ever communicated by Faulkner to her purported client and Faulkner unilaterally rejected all offers. Additionally, the settlement offers made by Faulkner were made unilaterally, without consultation with, and the consent and knowledge of, Cabala. …….………………….48

C. Faulkner testified that her clients do not have the sole exclusive right to accept or reject settlement offers, but that she, as counsel in a fee-shifting case, enjoyed and shared that right, jointly with her clients, since any settlement funds were to be paid to her, as legal fees...………..54

D.  Plaintiff's tactics in threatening Defendant with the fact that the FDCPA was a fee shifting statute, while refusing to identify the attorney's fees then incurred for purposes of settlement was unreasonable. Further, Plaintiff's settlement demands during the course of litigation, purporting to reflect the amount of legal fees then incurred by Plaintiff's counsel, admittedly were inflated at the time provided………………………57

CONCLUSION………………………………………………………………...58

CERTIFICATE OF COMPLIANCE…………………………………………...59

# TABLE OF AUTHORITIES

**CASES**                                                    **PAGE**

Abraham v. Volkswagen of America, Inc.,
  1991 WL 89917 (W.D.N.Y. 1991) …………………………..…49, 50, 51

Alliance to End Repression v. City of Chicago,
  820 F.2d 873 (7th Cir. 1987)………………………………………......…38

Ankerman v. Mancuso, 271 Conn. 772 (2004)………………………….…55, 56

Automobile Ins. Co. of Hartford v. Electrolux Home Products, Inc.,
  2011 WL 3295510 (W.D.N.Y. 2011)…………………………..……35, 41

Carroll v. Wolpoff & Abramson, 53 F.3d 626 (4th Cir.1995)……………..……..29

Cohen v. American Credit Bureau, Inc.,
  2012 WL 847429 (D.N.J. 2012)…………...………………29, 30, 37, 41, 42

Cresswell v, Prudential-Bache Securities, Inc.,
  675 F.Supp. 106 (S.D.N.Y. 1987)………………………………...……38, 39

DeVittorio v. Hall, 2007 WL 4372872 (S.D.N.Y. 2007)………………………... 44

Evans v. Port Auth. of N.Y. & N.J., 273 F.3d 346 (3d Cir. 2001)……..…..….29, 30

Fennell v. TLB Kent Co., 865 F.2d 498 (2d Cir. 1989)………..……..…..48, 49, 54

French v. Corporate Receivables, Inc., 489 F.3d 402, 404 (1st Cir. 2007)…...30, 31

Graziano v. Harrison, 950 F.2d 107 (3d Cir.1991)……………..……...............28

Jacobson v. Healthcare Financial Services, Inc.,
  516 F.3d 85 (2d Cir. 2008)……………………………………28, 29, 31

Jerman v. Carlisle, McNellie, Rini Kramer & Ulrich LPA,
  __ U.S. __ , 130, S.Ct. 1605 (2010)……………………………………37, 38

Kane v. U-Haul Int'l, Inc., 2005 WL 261935 (D.N.J. 2005)………….…..35, 41, 42

Kuhne v. Law Offices of Timothy E. Baxter and Associates, P.C.,
    2009 U.S. Dist. LEXIS 53317 (E.D.Mich. 2009)……………....………..39

Lee v. Thomas & Thomas, 109 F.3d 302 (6th Cir. 1997)…………………….36, 37

Matthews v. Lynch, 2007 WL 2407363 (D.Conn. 2007)…………………………44

McCauley v. Trans Union, L.L.C., 402 F.3d 340 (2d Cir. 2005)…………...…….41

Menard v. Morris, No. 3:09-cv-1165(VLB) (D.Conn. 2009)…........23, 24, 45, 46, 47

Miller v. Byrne, 916 P.2d 566 (Colo.App. 1995)………………………...…...49, 50

Murphy v. Equifax Check Service, Inc.,
    35 F.Supp. 200 (D.Conn. 1999)……………………….……31, 32, 34-38, 41

Preveden v. Hahn, 36 F.Supp. 952 (S.D.N.Y. 1941)………………………...……49

Public Interest Research Group of NJ, Inc. v. Windall,
    51 F.3d 1179 (3d Cir.1995)…………...……………………………….....29

U.S. Fidelity and Guar. Co. v. Braspetro Oil Servs. Co.,
    369 F.3d 34 (2d Cir. 2004)……………………………………...……..42

U.S. v. Int'l Bhd of Teamsters, 986 F.2d 15 (2d Cir. 1993)………………………44

Rand v. Monsanto, 926 F.2d 596 (7th Cir. 1991)………………………...……..38

Rankin v. City of Niagra Falls, 2012 WL 1565660 (W.D.N.Y 2012)……...……..49

Steele Co. v. Citizens for a Better Environment, 523 U.S. 83 (1998)……………35

# OTHER AUTHORITIES

15 U.S.C. § 1692……………...…………………..………………………1, 28

28 U.S.C. § 1331……………………………………..………………………1

28 U.S.C. § 1367…………………………………………………………...1

Connecticut Rules of Professional Conduct – Rule 1.5…….………………….…..45

Connecticut Rules of Professional Conduct – Rule 1.4……………....…….52, 53

Connecticut Rules of Professional Conduct – Rule 1.2……….….…...…….53, 55

## JURISDICTIONAL STATEMENT

Pursuant to 15 U.S.C. § 1692k; 28 U.S.C. § 1331, and 28 U.S.C. § 1367, this Court has jurisdiction over this appeal by virtue of the <u>Memorandum of Decision Granting Plaintiff's Motion for Attorney's Feed [Dkt. #76]</u> issued by the Honorable Vanessa L. Bryant U.S.D.J. dated August 24, 2012 which is a final order of judgment disposing of all parties claims in the matter of <u>Cabala v. Morris</u>, Civil Action No. 3:09-cv-651(VLB) District of Connecticut. An appeal was taken by the Appellant, the Estate of Benjamin Morris through its Co-Executrix Kim Morris and Co-Executor Timothy Crowley by Notice of Appeal filed on September 18, 2012.

## STATEMENT OF ISSUES PRESENTED

1.      Whether the District Court erred in granting Plaintiff's Application for Attorney's Fees in connection with a claim for violation of the Fair Debt Collection Practices Act – 15 U.S.C. § 1692 <u>et</u> <u>seq</u>., under circumstances where Plaintiff's counsel continued prosecution of the action subsequent to the defendant offering the maximum recoverable amount of statutory damages, and a Court hearing to determine attorney's fees.

2.      Whether the District Court erred in granting Plaintiff's Application for Attorney's Fees under circumstances where the fees were not "reasonable" based on Plaintiff's counsel's tactics and conduct, and where the continued prosecution

of the FDCPA claim was not to validate the rights of the consumer plaintiff, but rather, to generate increased attorney's fees for Plaintiff's counsel.

The defendant believes the District Court erred in both respects and that that subject decision should be reversed.

## STATEMENT OF THE CASE

On or about April 21, 2009, Plaintiff-Appellee Joel J. Cabala (the "Plaintiff or "Cabala"), through his purported attorney Joanne Faulkner ("Faulkner"), commenced the subject action against Defendant-Appellant Benjamin Morris (the "Defendant" or "Morris") for alleged violation of 15 U.S.C. § 1692 et seq., the Fair Debt Collection Practices Act (the "FDCPA"). This action was commenced to collect statutory damages under the FDCPA in the amount of $1,000.00 plus, attorney's fees in connection with the collection thereof. [A12-A13]

The contested issues in this lawsuit, and this subsequent Appeal, were never about the underlying merits of Plaintiff's FDCPA claim. Further, the Application for Attorney's Fees litigated below and appealed herein, is not predicated, in any manner, on the customary or predictable issues that comprise fee disputes, such as rates, hours, or work performed. Rather, this case goes to the heart of the viability and judicial sanctionability of an attorney's tactics and conduct in the prosecution of a fee-shifting case being prosecuted solely to generate increased attorney's fees for the benefit of prosecuting counsel.

2

After over one year of disputes between counsel over Plaintiff's counsel's attorney's fees; after the rejection of numerous offers of settlement by Plaintiff's counsel of full statutory damages and a judicial determination of attorney's fees and costs; after Plaintiff's counsel's consistent refusal to reveal actual attorney's fees then incurred, through the discovery process and otherwise, for settlement purposes; after Plaintiff's counsel repeatedly taunted that "tick-tock", this is a fee shifting case, Defendant agreed to a Stipulated Judgment with a Court determination as to the reasonableness of Plaintiff's fees based on counsel's conduct and tactics.

On September 9, 2010, the parties jointly filed a stipulation of judgment requesting the District Court enter judgment in favor of Plaintiff in the amount of $1,001.00 representing statutory damages under the FDCPA (the "Stipulation of Judgment"). [A20] Under the terms of the Stipulation of Judgment, the parties agreed to submit the issue of attorney's fees and costs to the District Court for disposition.

On September 15, 2010, Faulkner filed a Fee Application with the District Court seeking attorney's fees in the amount of $21,665 and costs in the amount of $869.82 (the "Fee Application). [A23] Defendant filed his initial Opposition to the Fee Application on October 6, 2010 based upon the fact that Plaintiff and/or his counsel continued unnecessarily to prosecute the FDCPA action after Defendant

had offered to settle the action by payment of all damages, costs, and fees Plaintiff could possibly recover if successful at trial. [A61]

Defendant filed a Motion for Extension of Time to Conduct Post-Judgment Discovery for purposes of demonstrating reasonableness of the fees (Document No. 60) [A35], which motion was granted by the Court on April 7, 2011 (Document No. 66) [A8]. Consistent therewith, Defendant took the depositions of Plaintiff and Faulkner.

Those depositions revealed additional substantive facts undermining the reasonableness of the attorney's fees claimed, and supporting that the prosecution of this FDCPA claim was undertaken solely for the purpose of generating attorney's fees for the sole benefit of counsel. By way of example, none of the settlement offers made by Defendant were ever communicated to the Plaintiff, nor was the Plaintiff informed or consulted regarding Defendant's settlement offers, which were unilaterally rejected by Faulkner. [A34; A72; A87; A93-A96] Plaintiff's counsel had never been retained by Plaintiff, and in fact, was contractually prohibited from communicating with Plaintiff by an agreement with another attorney. [A82; A83-A86] Counsel even testified that her client did not enjoy the sole exclusive right to accept or reject settlement offers, but that she, as counsel in a fee-shifting case, enjoyed that right, jointly with her purported client since they were her legal fees being settled. [A80-A81]

As a result of the aforementioned information disclosed during Post-Judgment depositions, Defendant filed a Supplemental Objection to the Fee Application, further objecting to the reasonableness of the attorney's fees (Document No. 71) [A8].

The District Court denied Faulkner's Fee Application without prejudice to re-filing ordering in relevant part as follow:

> The Court notes that absent a showing of bad faith, a party's declining settlement offers should [not] operate to reduce an otherwise appropriate fee award. Ortiz v. Regan, 980 F.2d 138, 140-141 (2d Cir. 1992) (quoting Cowan v. Prudential Ins. Co. of Am., 728 F.Supp. 87, 92 (D.Conn. 1990))….If Plaintiff files a renewed motion for attorney fees, Plaintiff shall address all factual allegation that Plaintiff's actions in declining settlement were done in bad faith." (Document No. 80) [A8]

Plaintiff filed a renewed Fee Application on September 6, 2011 [A100] and subsequent thereto, Defendant filed his objection consistent with the District Court's Order (Document No. 80) [A9] to analyze the reasonableness of the attorney's fees under a "bad faith" analysis (Document No. 77). [A9]

On August 24, 2012, the District Court issued a Memorandum of Decision[1] Granting Plaintiff's Motion for Attorney's Fees [Dkt. #76] (the "Decision"),

---

[1] Judge Bryant's Memorandum of Decision did not establish a burden on the Defendant to demonstrate "bad faith", but rather, appears to analyze whether counsel's fee's were reasonable, primarily relying on the Loadstar analysis set forth in pages 5-6 of the Decision. [A109-A110]

awarding Faulkner $32,489.29 in attorney's fees and costs (Document No. 88). [A105] On September 18, 2012, Appellant filed his Notice of Appeal with the District Court. [A122]

## STATEMENT OF FACTS

This action was commenced in April, 2009 under the FDCPA, seeking statutory damages of $1,000.00 plus reasonable costs and attorney's fees. [A12-A13] The Complaint contains nine brief paragraphs, primarily boilerplate, the recitation of which fills approximately one half of one sheet of paper. [A12-A13] Plaintiff's counsel (according to PACER) has commenced over 1200 FDCPA cases in Connecticut.

At the inception of the case, Defendant turned the matter over to counsel, who, by correspondence to Faulkner dated June 25, 2009, offered to settle this matter for the maximum statutory damages of $1,000.00 plus offering to have the Court hold a hearing on attorney's fees. [A31] In that correspondence, Plaintiff's counsel, Attorney Rubin ("Rubin") stated as follows:

> [M]y client offers to pay Mr. Cabala the maximum statutory fine of $1,000.00 under 15 U.S.C. 1692 et seq. and further offers to have the court hold a hearing on your client's claim for attorney's fees as demanded in his request for full and final settlement of all claims by Mr. Cabala against Benjamin Morris and CUDA & Associates, LLC. In essence, my clients are offering to pay your client 100 cents on the dollar to settle this matter. In the event your client does not accept this settlement offer, the only additional monies that possibly could be recovered by the Plaintiff in this matter are additional legal fees and

costs to prosecute this action. Thus, under those circumstances you and your client would be presenting a complaint for the sole and improper purpose of 'needlessly increasing the cost of litigation,' which is specifically prohibited by Rule 11 of the Federal Rules of Civil Procedure." [A31]

That offer was rejected by Faulkner, who continued to prosecute the case.

Over the course of the next year, the Defendant sought to obtain the amount and basis of Plaintiff's legal fees for settlement purposes, but was thwarted at every turn by Plaintiff's counsel. By e-mail from Rubin to Faulkner dated August 4, 2010, the Defendant again offered to settle the litigation for payment of full statutory damages and a Court determination of fees. [A45] That offer also was rejected by e-mail from Faulkner to Rubin dated August 4, 2009. [A46] In that August 4, 2009 e-mail, Faulkner further states that "the only way I can settle an FDCPA case is either a judgment plus fee application or a lump sum (say $4,500) and a withdrawal."[2] [A46]

As learned later through post-judgment discovery, as set forth, <u>infra</u>, Cabala never had the opportunity to consider Defendant's settlement offers, as none of Defendant's settlement offers were even conveyed by Faulkner to Cabala. Rather, they were unilaterally rejected by Faulkner.

---

[2] As discussed, <u>infra</u>, Judge Bryant found that Faulkner's position that attorney's fees were not recoverable absent the entry of judgment was not founded in law. [A111]

By e-mail from Faulkner to Rubin dated August 5, 2009, Faulkner refused to provide her legal bills so Defendant could confirm her claimed fees. [A47-A48] ("You can see my privileged legal bills when I apply for a fee award.").[3] Rubin responded via e-mail to Faulkner dated August 5, 2009, [A49], "We will not pay legal fees in connection with a settlement without seeing what those fees are. If you are seeking them in litigation, they are not privileged and I am entitled to see them during the discovery process."

Defendant then sought to determine Faulkner's fees through the discovery process. [A24-A30] When Plaintiff responded to Defendant's First Set of Interrogatories, and Requests for Production, response to Document Requests 9-11, in which Defendant sought information and documentation relating to claimed attorney's fees, Faulkner objected and argued "Plaintiff does not seek attorney Faulkner's fees as a measure of damages. If Plaintiff prevails, he will apply for fees and costs post judgment in the time and manner provided by Fed R Civ P. 54. Prior to judgment, the request is irrelevant." [A29]

By e-mail from Rubin to Faulkner dated January 27, 2010 [A33-A34] Rubin summarizes the settlement discussions between the parties, and reiterated the Defendant's continued offers to pay full statutory damages and reasonable

---

[3] Judge Bryant further found that Faulkner's position that her attorney's fees were privileged also was not founded in law. [A110].

attorneys fees as determined by a Magistrate, which was rejected by Faulkner. "When we discussed settlement in December at Ben's deposition, we again offered to pay the full $1,000.00 in penalties plus reasonable attorneys fees. We suggested a conference before the Magistrate to determine the reasonableness of your fees. You rejected that offer." [A33]

By correspondence dated May 3, 2010, [A50] Rubin wrote Faulkner requesting a simple figure – the amount of fees and costs incurred to date. "At your earliest convenience, please provide my office with an updated Attorney's Fees and Costs figure for the above-referenced matter. Said information is for purposes of evaluating potential settlement of this matter and/or for a potential offer of judgment." Faulkner responded by e-mail dated May 6, 2010, in which she refused to provide the requested figure. "In any event, we have gone round and round on this unproductively before. If you client stips to judgment of $1001 in each case we can discuss fees and costs. Or I can apply for them." [A51]

By e-mail from Rubin to Faulkner dated May 6, 2010, [A52] Rubin wrote "Per you e-mail, it appears that you are refusing to provide me with amount of fees and costs that you claim are due and owing as of today for these matters. My client wishes to review the amount of attorney's fees you claim as of the current date in order to analyze a settlement of these matters and/or a possible offer of judgment. Please provide the <u>amount</u> of fees and costs in the Cabala and Menard matters as

soon as possible." (emphasis in original). By e-mail from Faulkner to Rubin dated May 14, 2010, [A53] Faulkner again refused to provide the amount of her fees, unless the Defendant filed an offer of judgment, and "reminded" the Defendant that the case was a fee shifting case and that fees were continuing to accrue. "If you make the 'easy' offer of judgment, I will give you the fee run that I propose to submit to the court (after exercising my billing judgment) and perhaps we can resolve the matter without a formal fee application. Really, the $1,001 is not the sticking point. The continual accrual of fees is always the Defendant's problem in a FDCPA case. I plan to start working on the Cabala response today, so if you want to fend that fee accrual off, make an offer." The Defendant persisted by e-mail dated May 20, 2010, [A54] "I have asked you to provide me with the amount of fees and costs you claim are due and owing, and you are refusing to provide me with that information.…Please provide me with a calculation of your fees and costs on the Menard and Cabala matters." By e-mail dated May 20, 2010, [A55-A56] Faulkner responded as follows: "It is hard to provide a figure because fees are a moving target, always going up as we speak. These figures will increase imminently, but you can get an agreement by the end of today, your client can settle for the $1,001 each case plus … $15,000 and $869.82 costs in Cabala.

It is almost as if Plaintiff's counsel turned the District Court proceedings into a game of "chicken" or "blind man's bluff" -- threatening the Defendant with

10

increasing fees, while, at the same time, continually withholding, denying and refusing to identify the basis of the increasing fees she was demanding that the Defendant blindly pay, and, at times, refusing to identify even the <u>amount</u> of the fees sought. The impropriety of this is exacerbated by the fact that counsel's attorney's fees were the <u>sole</u> basis of the continued litigation.

On July 8, 2010, Defendant served the Plaintiff with an Offer of Compromise, which, also, was never even conveyed by Faulkner to her purported client.

In an effort to contain the claim for legal fees which was then spiraling out of control, the Defendant felt he had little alternative but to stipulate to a judgment and let the District Court determine the "reasonableness" of the claimed attorney's fees relative to counsel's conduct and tactics. With proper leave of the Court, after the parties jointly filed a stipulation for judgment in the amount of $1,000.1 in damages, the Plaintiff undertook post-judgment discovery for purposes of addressing the reasonableness of the fees sought, including conducting the depositions of Plaintiff and Faulkner (Document No's 60 and 65). [A7-A8]

Those depositions revealed additional facts that, when viewed cumulatively, further undermine the reasonableness of the attorney's fees claimed by Plaintiff and which further evidence that the continued prosecution of the FDCPA claim

was not to validate the rights of the consumer Plaintiff, but rather, to generate attorney's fees for the sole benefit of counsel.

- First, counsel was never retained by Cabala to represent his interests in the FDCPA matter, she never communicated directly with Plaintiff and, in fact, was contractually prohibited from contacting Plaintiff by agreement with another attorney.

Faulkner was never retained by the Plaintiff to represent him in this matter, and there was no agreement between counsel seeking to collect legal fees herein and the client as to the material terms or scope of legal representation. More specifically: (i) there is no letter of representation, no engagement letter, or any agreement establishing the terms and/or scope of representation relative to the FDCPA action or otherwise; (ii) there is no agreement and/or advisement or even a disclosure to Cabala relative to Faulkner's fees, hourly rate, or manner of compensation, or the way in which any fees might be collected or recovered; (iii) Cabala and Faulkner never communicated directly regarding the FDCPA violation action prior to the date of Cabala's deposition, nearly two years after the action was commenced; (iv) pursuant to her arrangement with Cabala's other counsel, Faulkner was expressly prohibited from any direct communication with Cabala despite the fact that she was purporting to represent him as a Plaintiff in this action.

Initially, the testimony of both Cabala and Faulkner evidences that Faulkner was not retained by Cabala to represent him in this FDCPA action, undermining

any claim for attorney's fees in that action. To the contrary, the only attorney engaged by Cabala in connection with the FDCPA violation claim was Attorney Irving Pinsky ("Pinsky"), who did not appear in the action. In essence, Pinsky – not Cabala – allegedly engaged Faulkner to commence and prosecute the claim absent any consultation or any communication between Faulkner and Cabala.

As Cabala testified:

Q. But to the best of your knowledge, is there any agreement that references or reflects any agreement between you and Joanne Faulkner relating to representation?

A. You would have to ask Attorney Pinsky that. I can't -- I can't answer. I retained Attorney Pinsky, and he retained Attorney Faulkner. So you'd have to ask him. I don't know,

Q. But to the best of your knowledge there is no agreement directly between you and Attorney Faulkner?

A. I would agree with that.

(Joel Cabala Deposition Testimony, pp. 53, lines 22-25, pp. 54, lines 1-8.) [A75-A76]

***

Q. Has Mrs. Faulkner ever provided you with a retainer letter?

A. I don't believe so. If she has, I don't remember it.

(Joel Cabala Deposition Testimony, pp. 11, lines 22-25.) [A62]

***

Q.  What is your understanding of what that agreement reflects relating to your agreement with Attorney Pinsky?

A.  That Irving Pinsky would handle the matter in the best manner that he saw fit.

Q.  Including representing you in connection with the Fair Debt Collection Practices Act?

A.  Yes.

(Joel Cabala Deposition Testimony, pp. 10, lines 10-17.) [A61]

The fact that Cabala did not retain Faulkner in connection with this matter is further evidenced by the fact that there was no engagement letter, retainer agreement, or other agreement between Faulkner and Cabala establishing the terms of representation. There was no agreement (written or oral) as to the scope and/or terms of representation, there was no agreement as to the hourly rate or fee structure, or the manner in which Faulkner would be compensated, if any.  There simply was no agreement that would permit Faulkner to recover any fees in a Fee Application.

Q.  Who did Attorney Faulkner charge fees to resolve this issue, to the best of your understanding?

A.  I don't know.

Q.  Do you know if Attorney Faulkner charges fees to anybody?

A.  I assume she had to charge somebody.

(Joel Cabala Deposition Testimony, pp. 14, lines 18-25) [A63]

Moreover, during her testimony, Faulkner admitted that she did not have an agreement, in writing or orally, with Cabala, and that she did not even have a written or oral agreement with Pinsky directly relating to her representation of Cabala. Further, to the extent that Faulkner believed there was a generic oral agreement between her and Pinsky relating to her purported representation of his clients in FDCPA cases, by her own testimony, the agreement does not set forth the scope of representation, the hourly rate, the manner of compensation, the authority of Faulkner or any other material terms other than the fact that Faulkner is to have no communication with Pinsky's client and that Faulkner will be paid for her services by the Defendant.

As Faulkner testified:

Q.  Did you ever enter into -- provide Mr. Cabala with a letter of representation?

A.  Mr. Cabala's testimony today was accurate: There was no retainer agreement; there was no billing records; there was no communications directly with Mr. Cabala; and there was no payment of -- and the payment of monies I brought, which you will notice was with -- to Mr. Pinsky.

(Joanne Faulkner Deposition Testimony, pp. 83, lines 23-25; pp. 84, lines 1-5.)

[A82-A83]

***

Q.  [S]o there is no specific written agreement as it pertains to Mr. Cabala?

A.  Not that I know of.

15

Q.  And there's no written agreement that you're aware of within the last ten years or so [between you and Pinsky] that addresses this type of a relationship?

A.  Not that I'm aware of.

(Joanne Faulkner Deposition Testimony, pp. 84, lines 22-25; pp. 85, lines 1-4.)

[A83-A84]

Moreover, in addition to the absence of any agreement or terms of representation between Faulkner and Cabala, pursuant to her oral agreement with Pinsky, there was to be absolutely no direct communication between Faulkner and Cabala.  Notably, even the settlement check representing the $1,001.00 statutory damages went directly to Pinsky – not to Cabala.

Q.  Please provide me oral -- all material terms of the oral agreement that you currently have with Mr. Pinsky relating to your representation of Mr. Cabala in this case.

A.  And I did.

Q.  No. I want -- please repeat them.

A.  All communications go through Mr. Pinsky. I get my fees and costs for my court work from Defendants, not from his clients.

(Joanne Faulkner Deposition Testimony, pp. 88, lines 23-25; pp. 89, lines 1-6.)

[A85-A86]

***

Q.  So when you paid Mr. Cabala his $1001.00 in connection with the judgment, you paid that to Mr. Pinsky?

A. That was per our agreement, all the communications with Cabala.

Q. Whose agreement?

A. Pinsky's and mine.

(Joanne Faulkner Deposition Testimony, pp. 84, lines 6-12.) [A83]

As such, the evidence belies a viable or lawful attorney-client relationship between Faulkner and Cabala that could support an award of attorney's fees in this matter.

- Second, none of the settlement offers made by Defendant to Cabala were communicated by Faulkner to her purported client and Faulkner unilaterally rejected all offers. Additionally, settlement offers made by Faulkner were made unilaterally, without consultation with, and the consent and knowledge of, Cabala.

Initially, Cabala's testimony established that he wanted to be consulted relative to settlement offers tendered by the Defendant. [A70] However, Cabala's and Faulkner's testimony established that Faulkner did not convey to, or consult with, Cabala concerning any settlement offers made by the Defendant. Further, Faulkner's testimony evidenced that she did not convey settlement offers she made on Cabala's behalf, or settlement offers conveyed by Defendant, to Pinsky. Significantly, Cabala testified that he would have accepted a settlement offer that paid him the maximum statutory fee and attorney's fees and costs incurred – an offer that was rejected by Faulkner without consultation with Cabala or Pinsky.

As Cabala testified:

Q.  Did Attorney Faulkner have the right to make a settlement offer in this case without your consent?

A.  I don't believe so.

Q.  So if she didn't have the right to make a settlement offer without your consent, then you believe that you had the right to at a minimum be involved in the settlement discussions?

A.  I would guess, yes.

Q.  If settlement offers were made by Attorney Morris you believe you'd have the right to know?

A.  Yes.

(Joel Cabala Deposition Testimony, pp. 34, lines 12-23.) [A70]

However, as Cabala testified, Faulkner did not convey to him, or discuss with him, settlement offers she purportedly made on his behalf.

Q: And to the best of your recollection you don't recall discussing with Attorney Faulkner settling this case for $3,350 on or about April 29, 2009, correct? (Attorney Faulkner's settlement offer at the inception of the case reflected in her fee run [A7] Document No. 57-3, pp. 1-3)

A: Attorney Faulkner, no. If I had discussed it with anybody, it would have been with Irving Pinsky, who would have relayed Attorney Faulkner's messages, or whatever, you know, to me, through him, since he was the attorney representing me.

18

(Joel Cabala Deposition Testimony, pp. 39, lines 16-24.) [A71]

Despite the foregoing expectation of her purported client, Faulkner consistently unilaterally tendered and rejected settlement offers absent any consultation with Plaintiff or without even conveying said offers to Plaintiff. As Faulkner testified:

Q. Did you communicate that offer to settle with Mr. Pinsky?

A. That offer to settle?

Q. Yes.

A. Probably not.

Q. Did you discuss the offer to settle on 6/27/09, the 3,350, with Mr. Pinsky?

A. Probably not.

(Joanne Faulkner Deposition Testimony, pp. 94, lines 19-25; pp. 95, line 1.) [A91]

***

Q. Did you relate the settlement offer reflected on Exhibit 19 (settlement letter from Rubin to Faulkner dated June 25, 2009) [A31-A32] to Mr. Cabala?

A. No.

Q. Did you relate it to Mr. Pinsky?

A. I don't think so.

(Joanne Faulkner Deposition Testimony, pp. 97, lines 24-25; pp. 98, lines 1-3.)

[A31]

***

Q. Do you have a recollection of relating the settlement offer reflected in

Exhibit 20 (e-mail from Rubin to Faulkner dated August 4, 2009, 01:58 pm)

[A45] to Mr. Cabala?

A. No. I would not have conveyed that to him.

Q. Do you have any recollections of conveying the settlement offer reflected

in Exhibit 20 to Mr. Pinsky?

A. No.

(Joanne Faulkner Deposition Testimony, pp. 100, lines 3-11.) [A95]

***

Q. So was Mr. Cabala's testimony accurate in that all communications

relating to any settlement matters or offers in this case made by Attorney

Morris were not communicated by you to Mr. Cabala?

A. Right.

(Joanne Faulkner Deposition Testimony, pp. 90, lines 20-24.) [A87]

Moreover, Defendant's counsel's June 25, 2009 correspondence to Faulkner,

offering to settle this action at its inception for the maximum recovery possible for

Defendant, including the maximum statutory fee of $1,000.00 and a Court

determination of attorney's fees and costs [A31], was unilaterally rejected by

Faulkner absent any consultation with her purported client and without having ever

communicated the settlement offer to Cabala. [A87] Faulkner elected to continue to prosecute the action absent any consultation with Cabala.

Q. Did you relate the settlement offer reflected in Exhibit 19 [the June 25, 2009 settlement offer] to Mr. Cabala.

A. No.

Q. Did you relate it to Mr. Pinsky?

A. I don't think so.

(Joanne Faulkner Deposition Testimony, pp. 97, lines 24-25, pp 98, lines 1-3.) [A93-A94]

Similarly, Cabala testified that he was unaware of Defendant's numerous settlement offers.

Q. [Mr. Cabala] So my question is: Are you aware, as of June 25th, 2009, that my client offered to pay the entirety of the $,000 fees and to have the court hold a hearing on the claim for attorney's fees?

A. No, I wasn't aware….

(Joel Cabala Deposition Testimony, pp. 42, lines 2-6) [A72]

Further, when asked whether he would have accepted an offer that paid him the maximum statutory amount as well as all attorney's fees and costs to date, he indicated he would have accepted such an offer.

Q.  Had it been made, and had it been made -- that it been presented to you clearly, had you understood that you would receive your thousand dollars, which would be the maximum you could receive, and that the court would hold a hearing on Attorney Faulkner's fees, and entered an order ordering the payment of her fees after that hearing, would you have accepted that offer?

A.  Well, I say, if it had been advised by Irving that that was the course of action to take, yes, then I would have said -- then I would have agreed to it. However, without Irving advising me as to whether that was the best course of action to pursue for Attorney Faulkner, I couldn't -- I couldn't say yes or no without having some input from -- I'd refer that entire questioning to Irving Pinsky.

(Joel Cabala Deposition Testimony, pp. 45, lines 1-12.) [A73]

***

Q.  And had you been informed that Attorney Faulkner would get what she was entitled to then it would have been accepted?

A.  if she was going to get what she was entitled to, what she had billed for, I don't think we would be here today, would we?

Q.  So then it would have been accepted?

A.  If she was going to get what she had billed for this case, yeah, it would

have been accepted.

(Joel Cabala Deposition Testimony, pp. 46, lines 3-12.) [A74]

As such, the facts demonstrate that Faulkner withheld material information

from Cabala, information which she had a legal and ethical obligation to convey,

that undermined Cabala's right and ability to determine the objectives of his

lawsuit and of Faulkner's proposed representation of his interests.

- • Third, Faulkner testified that her clients do not have the sole exclusive right to accept or reject settlement offers, but that she, as counsel in a fee-shifting case, enjoyed and shared that right, jointly with her clients, since any settlement funds were to be paid to her, as legal fees.

By her own admission, Faulkner's standard retainer agreement provides her,

not her client, with control over whether an action can be settled, thereby not only

providing Faulkner with an economic stake in the litigation, but also full implied

control over when and how a case can be settled.

Faulkner's deposition was conducted in two matters simultaneously

resulting in a single deposition transcript: this matter, and the similarly situated

matter of Menard v. Morris, Case Action Number 3-09-cv-01165-VLB. As

Faulkner testified at the deposition:

Q.  Who had the authority to -- who had the authority to settle this case, you

or Ms. Menard?

23

A. Both of us.

Q. Individually or collectively?

A. Collectively.

Q. If Ms. Menard stated that she wanted to settle this case for her $1,001.00 at any point is that her right?

A. No.

Q. Why not?

A. She agrees that I get fees as well.

Q. Where does it say that?

A. It says I take my attorney fees and expenses first out of any amounts. So if she wants to settle for a thousand dollars I get it.

***

Q. But I just want to understand the structure. You've testified that if there's a settlement offer made, and you've got $10,000 worth of fees in a case, and the settlement offer is for … $5,000, that money goes to you first under this agreement?

A. Right.

(Faulkner Deposition Testimony pp. 58, lines 18-25, pp. 59 lines 1-7 and 13-19.)

[A80-A81]

- Fourth, Plaintiff's tactics in threatening Defendant with the fact that the FDCPA was a fee shifting statute, while refusing to identify the attorney's fees then incurred for purposes of settlement was unreasonable. Further, Plaintiff's settlement demands during the course of litigation, purporting to reflect the amount of legal fees then incurred by Plaintiff's counsel, admittedly were inflated at the time provided.

Faulkner's conduct in continually threatening Defendant with the fact that the FDCPA is a fee shifting statute and that her fees were constantly increasing, while simultaneously withholding and refusing to identify the increasing fees she was demanding Defendant blindly pay, left Defendant with little choice other than to pay plaintiff's demanded fees in a vacuum, or to defend the matter in the context of what Plaintiff's counsel repeatedly warned was a fee shifting case.

Additionally, the amount of attorney's fees demanded by Plaintiff's counsel to settle this matter was inflated at the time of the settlement demands in relation to the actual fees incurred at the corresponding point in time of the litigation. Faulkner admitted as such in her deposition:

Q. Drawing your attention to Exhibit 18, on 4/29/2009 you made an offer to settle the case for $3,350.00.

A. Right.

Q. And you would agree, would you not, that that didn't reflect you actual attorney's fees incurred up until that date and time?

A.  Oh, absolutely. I never got a response to any of my settlement offers either.

Q.  I'm sorry. That wasn't my question.  At the time that you made that settlement offer of $3,350.00, your actual fees were approximately $1,242.50?

A.  At that time, yes, plus costs.

Q.  And the costs were what $350.00

A.  350 I think at that time.

(Joanne Faulkner Deposition Testimony, pp. 92, lines 18-25; pp. 93, lines 1-8.) [A89-A90]

***

Q.  So, Attorney Faulkner, it's correct that at the time that you offered to settle this matter for $3,350.00 your actual cost and expenses in connection with this matter were $2,593.50?

A.  Right.

(Joanne Faulkner Deposition Testimony, pp. 93, lines 15-19.) [A90]

***

Q. Do you recall me asking you for a copy of your fee run?

A.  Yes.

Q.  Do you recall whether or not you provided it?

A.  I did not.

Q.  Why?

A.  I never do.

(Joanne Faulkner Deposition Testimony, pp. 101, lines 24-25; pp. 102, lines 1-6.)

[A96-A97]

***
Q. Do you recall me asking you simply for the number, the amount of your

attorney's fees?

A.  Yes. And I gave it to you.

(Joanne Faulkner Deposition Testimony, pp. 102, lines 15-17.) [A97]

***
Q.  Did you give it to me as soon as I asked you for it?

A.  Oh, no.

Q.  Why not?

A.   Because, once again, it's written in stone, and I just don't this it's

appropriate to give somebody a figure that they will now figure is written in

stone when it's not.  And that's what I said.  I said you cannot give a figure

because fees keep running. That's the nature of this thing.  You give a figure

one day, and the next day you do something and it's more.

(Joanne Faulkner Deposition Testimony, pp. 102, lines 23-25; pp. 103, lines 1-9.)

[A97-A98]

Faulkner's conduct and tactics, when viewed cumulatively, undermines the reasonableness of the attorney's fees claimed by Plaintiff and evidences that the continued prosecution of this matter was undertaken not to vindicate the rights of the Plaintiff consumer, but to generate attorney's fees for the benefit of counsel.

## STANDARD OF REVIEW

The standard of review for decisions to award attorney's fees under the FDCPA is "abuse of discretion". Jacobson v. Healthcare Financial Services, Inc., 516 F.3d 85 (2008). "We generally review decisions to award or deny attorneys' fees for abuse of discretion. *Kerin v. U.S. Postal Serv.*, 218 F.3d 185, 188 (2d Cir. 2000)…. We adopt that approach , and hold that we review for abuse of discretion a district court's decision to award attorney's fees to a defendant pursuant to the FDCPA." Jacobson v. Healthcare Financial Services, Inc., 516 F.3d 85, at 96.

The standard for determining whether attorney's fees are "reasonable" under the FDCPA is also well established. The FDCPA provides that "in a case of any successful action," a prevailing party may recover, "the costs of the action, together with a reasonable attorney's fee as determined by the court." 15 U .S.C. § 1692k(a)(3). An award of reasonable attorney's fees and costs to a prevailing plaintiff in a FDCPA case is usually required. See Graziano v. Harrison, 950 F.2d 107, 113–14 (3d Cir.1991).

However, an award of fees is *not required* in "unusual circumstances," such as "bad faith" conduct on the part of a prevailing plaintiff. <u>Id.</u> at 114 & n. 13 ("The presence of bad faith conduct on the part of a plaintiff would surely be an unusual circumstance justifying a denial of attorney's fees." (citing <u>*DeJesus v. Banco Popular de Puerto Rico,*</u> 918 F.2d 232, 234 n. 4 (1st Cir.1990))).

<u>Cohen v. American Credit Bureau, Inc.</u>, 2012 WL 847429 (2012).

If an attorney's fee award is appropriate, the barometer for the quantum of the award is "reasonableness." A "reasonable" fee award is one that is "adequate to attract competent counsel, but which does not produce a windfall to attorneys." <u>Public Interest Research Group of NJ, Inc. v. Windall</u>, 51 F.3d 1179, 1185 (3d Cir.1995). <u>See</u> <u>also</u> <u>Carroll v. Wolpoff & Abramson</u>, 53 F.3d 626, 628–29 (4th Cir.1995) ("[t]hat successful plaintiffs are entitled to a fee award under the FDCPA does not mean, however, that they are entitled to the amount requested; they are entitled to what is reasonable under the circumstances.")

"A reasonable fee is generally calculated by application of the lodestar method, which requires multiplying the hours reasonably expended by a reasonable hourly rate. *See, e.g.,* <u>*Hensley v. Eckerhart,*</u> 461 U.S. 424, 433–37, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); <u>*Maldonado v. Houstoun,*</u> 256 F.3d 181, 184 (3d Cir.2001). The FDCPA, however, does not mandate a fee award in the lodestar amount. *See, e.g.,* <u>*Giovanni v. Bidna & Keys,*</u> 255 Fed. Appx. 124, 125 (9th Cir.2007); <u>*Carroll v. Wolpoff & Abramson,*</u> 53 F.3d 626, 628–29 (4th Cir.1995). *See also* <u>*Jerman v.*</u>

*Carlisle, McNellie, Rini Kramer & Ulrich,* ⸺ U.S. ⸺, ⸺ n. 16, 130 S.Ct. 1605, 1621 n. 16, 176 L.Ed.2d 519 (2011) (noting that "many" not *all* "District Courts apply a lodestar method...")." Cohen v. American Credit Bureau, Inc., 2012 WL 847429 (2012).

> If the concept of discretion is to have any meaning at all, it must encompass the ability to depart from the lodestar in appropriate circumstances. *Hensley* itself recognized that, in certain circumstances, an award in the lodestar amount may be excessive. *Carroll,* 53 F.3d at 628–29. In other words, rote application of the lodestar method must be tempered by the overriding principle of "reasonableness," which by necessity must account for "the facts and circumstances of the underlying litigation." *Id.* This is consistent with the reality that the district court "has a ringside view of the relevant conduct of the parties and of the underlying legal dispute." *Id.* (quoting *Alexander v. Mayor & Council of Cheverly Mass.,* 953 F.2d 160, 162 (4th Cir.1992)).

Evans v. Port Auth. of N.Y. & N.J.*, 273 F.3d 346, 362 (3d Cir. 2001).

"In calculating an appropriate fee award, a court should avoid compensating wasteful litigation. As the Sixth Circuit has explained, 'Waste is not in the public interest. The Congress that passed the Fair Debt Collection Practices Act in 1977 could hardly have wished to reward lawyers for doing nonproductive work and wasting their adversaries' time and the time of the courts as well. In directing the courts to award 'reasonable fees,' on the contrary, Congress undoubtedly wished to ensure that the lawyer representing a successful plaintiff would receive a reasonable fee for work reasonably found necessary-nothing less, and nothing

more.' _Lee v. Thomas & Thomas,_ 109 F.3d 302, 306-07 (6th Cir.1997)." French v. Corporate Receivables, Inc., 489 F.3d 402, 404 (1st Cir.2007).

## SUMMARY OF THE ARGUMENT

Numerous Courts throughout the country, including this Circuit in Jacobson v. Healthcare Financial Services, Inc. 434 F.Supp.2d 133, rev'd on other grounds, 516 F.3d 85 (2008), have noted that the FDCPA has spawned a "cottage industry" of litigants who do not utilize the FDCPA to ferret out collection abuse, but rather to promote a class of professional plaintiffs and lucrative litigation for attorneys. The conduct and tactics of Plaintiff's counsel in this case exemplifies the abuse of the fee-shifting protections afforded by the FDCPA, and conclusively and prohibitively undermines the "reasonableness" of counsel's claimed fees.

The United States District Court (Bryant, J.) abused its discretion in awarding the Plaintiff attorneys' fees in connection with Plaintiff's FDCPA claim. Initially, as a matter of law, once the Defendant offered to satisfy the Plaintiff's entire demand, there was no dispute over which to litigate, and any fees claimed thereafter are unreasonable. In Murphy v. Equifax Check Service, Inc., 35 F.Supp.2d. 200 (Dist. Conn. 1999) (Goettel, U.S.D.J.), the Connecticut District Court held that a Plaintiff's right to receive attorney's fees under the Fair Debt Collection Practices Act is cut off once the Defendant makes an offer to pay all damages, costs, and reasonable attorney's fees, regardless of whether it is made in

connection with an Offer of Judgment or simply an offer of settlement, and any attorney's fees incurred subsequent thereto are unreasonable under the FDCPA.

Further, Faulkner's additional conduct and tactics cumulatively evidences the unreasonableness of Faulkner's Fee Application.

Initially, the evidence belies a viable or lawful attorney-client relationship between Faulkner and Cabala that could support an award of attorney's fees in this action.

Second, Faulkner did not convey any of Defendant's settlement offers to the Plaintiff, despite having both a legal and ethical obligation to do so, and she proposed settlement offers on behalf of Plaintiff without his knowledge or consent.

Third, Faulkner unilaterally rejected the Defendant's settlement offers to Cabala. She testified that she and her client "collectively" had the authority to settle this case. In actuality, however, Faulkner's actions reflected that she believed she had the "unilateral" right to settle this case, as the primary recovery was for her attorney's fees. In so doing, Faulkner obtained an economic interest in this action such to undermine Cabala's interests, in violation of law.

And fourth, Faulkner unreasonably refused to identify the amount and basis of her attorney's fees during the litigation while, at the same time, making inflated settlement demands in amounts in excess of the any sums reasonably recoverable at the time for fees then actually incurred, all the while taunting the Defendant that

this was a fee-shifting case and that, in the absence of payment per her demands, her fees would keep increasing.

## ARGUMENT

I. THE DISTRICT COURT ERRED IN HOLDING THAT THE SUBJECT ATTORNEY'S FEES WERE "REASONABLE", AS THE PLAINTIFF'S CONTINUED PROSECUTION OF THIS ACTION SUBSEQUENT TO BEING OFFERED FULL STATUTORY DAMAGES AND A COURT HEARING TO DETERMINE ATTORNEY'S FEES RENDERS ALL ATTORNEY'S FEES SUBSEQUENTLY INCURRED UNREASONABLE AS A MATTER OF LAW.

The attorney's fees sought by Plaintiff were unreasonable as a matter of law as they were incurred after Defendant offered, on numerous occasions, to settle the action for the maximum recoverable amount of statutory damages, and a Court hearing to determine attorney's fees.

As the facts demonstrate, at the inception of this action, and thereafter, Plaintiff was offered the maximum amount of statutory damages recoverable in a case where no actual damages were incurred, as well as a Court hearing to determine attorney's fees, but Plaintiff's counsel unilaterally and consistently rejected the offer. [A31-A33 and A45-A56] The Plaintiff's conduct is contrary to law and precludes a finding that Plaintiff's attorney's fees incurred subsequent to the rejection of Defendant's settlement offer(s) are either reasonable or recoverable under the FDCPA.

In <u>Murphy v. Equifax Check Service, Inc</u>., 35 F.Supp.2d. 200 (D.Conn. 1999) (Goettel, U.S.D.J.),  a FDCPA violation claim in which Faulkner represented the Plaintiff, the Defendant offered to settle the Plaintiff's claim for the maximum statutory damages plus all reasonable fees and costs as determined by the Court, which was communicated to the Plaintiff by letter from Defendant's counsel. The Plaintiff rejected the offer. The Defendant then moved to dismiss the case for lack of subject matter jurisdiction. The District Court, Goettel, J. dismissed the case, finding that, subsequent to the settlement offer, the plaintiff no longer had a personal stake in the outcome of the litigation, and that the continued prosecution of the litigation for purposes of collecting increasing attorney's fees was unlawful for purposes of meeting the case-or-controversy requirement of Article III where there was no remaining controversy on the merits of the underlying claim.

The Court in <u>Murphy v. Equifax Check Services, Inc.</u> (Goettel, J.) held as follows:  "Having been offered the maximum amount of damages which she was entitled to recover under the FDCPA, plus reasonable attorney's fees and costs, Plaintiff no longer has a personal stake in the outcome of this litigation for purposes of meeting the case-or-controversy requirement of Article III ….The only interest remaining is that of her attorney. Were this case to proceed to trial, Plaintiff could lose, but she could not win more than what is now being offered to her by Defendant. Thus, continuing the instant case serves no legitimate purpose

whatsoever." <u>Murphy v. Equifax Check Service, Inc.</u>, 35 F.Supp.2d. 200, at 203-204. <u>See also</u> <u>Automobile Ins. Co. of Hartford v. Electrolux Home Products, Inc.</u>, 2011 WL 3295510 (W.D.N.Y. Arcara, J.), <u>citing</u> <u>Kane v. U-Haul Int'l. Inc.</u>, 2005 WL 261935 (D.N.J.) ("Because federal courts do not sit simply to bestow vindication in a vacuum, a federal court is required to dismiss a suit for lack of jurisdiction once a defendant has made an offer of complete relief.") [4]

The <u>Murphy</u> Court further reasoned that the plaintiff and/or plaintiff's counsel's continued prosecution of the FDCPA claim after receipt of the settlement offer rendered said attorney's fees unreasonable insofar as such a practice is contrary to the intent of Congress in enacting the FDCPA, which was not intended to create a cottage industry for purposes for the production of attorney's fees. While recognizing that the FDCPA is a fee-shifting statute, the Court also recognized and held that there are lawful limitations to the recovery of attorney's fees under the statute based on the reasonableness of the conduct and tactics of plaintiff's counsel.

---

[4] The Murphy Court relied on precedent from the United States Supreme Court, which, also, has re-affirmed that "an interest in attorney's fees is insufficient to create an Article III case or controversy where none exists on the merits of the underlying claim." <u>Steele Co. v. Citizens for a Better Environment</u>, 523 U.S. 83, 118 S.Ct. 1003, 1018, 140 L.Ed2d 210 (1998), <u>citing</u>, <u>Lewis v. Continental Bank Corp.</u>, 494 U.S. at 480, 110 S.Ct. 1249 (1990). "The litigation must give the plaintiff some other benefit besides reimbursement of costs that are a byproduct of the litigation itself." <u>Steele Co</u>., 118 S.Ct. at 1018.

It is apparently Plaintiff's counsel's [Joanne Faulkner, Esq.] view that she has a right under the FDCPA to continue this action so as to increase her attorney's fees, and that the accrual of such fees, (which will be paid by the Defendant if she prevails) is consistent with Congressional intent. While we do not profess to understand why the Act refers such small cases to the busy Federal Courts rather than to an administrative body for determination, there is nothing in the Act suggesting that it was intended to create a cottage industry for the production of attorney's fees.

The Court in the <u>Murphy v. Equifax Check Service, Inc.</u> further adopted the reasoning of the Court in the matter of <u>Lee v. Thomas & Thomas</u>, 109 F.3d 302 (6th Cir. 1997), in which the Circuit Court upheld the District Court's rejection of all Plaintiff's attorney's fees incurred for work performed subsequent to Defendant's offer to settle the action for "everything to which [the Plaintiff] could reasonably be considered entitled, including an attorney fee that appeared reasonable in light of the circumstances at the time." "The court found that it was unreasonable for the Plaintiff's attorney to continue to perform work after that settlement offer was made and, therefore, any fees incurred after that date were necessarily unreasonable." <u>Id</u>. at 306-07. The <u>Lee</u> Court continued, "In directing the courts to award 'reasonable' fees, Congress undoubtedly wished to ensure that the lawyer representing a successful Plaintiff would receive a reasonable fee for work reasonably found necessary -- nothing less, and nothing more....Congress could hardly have wished to reward lawyers for doing nonproductive work wasting their adversaries time and the time of the courts as well." <u>Murphy v. Equifax</u>

Check Service, Inc., 35 F.Supp.2d. 200, at 204, quoting Lee v. Thomas & Thomas, 109 F.3d 302, 306 (6th Cir. 1997).

Similarly, in Cohen v. American Credit Bureau, Inc., 2012 WL 847429 (D.N.J.) the United States District Court for the District of New Jersey recently addressed the issue of the reasonableness of a plaintiff's counsel recovering attorney's fees in a FDCPA action subsequent to the rejection of a settlement offer of full statutory damages and payment of all attorney's fees or a determination of fees by the Court. In denying the plaintiff recovery of attorney's fees incurred subsequent to such a settlement offer at the inception of the case, the Court noted that plaintiff's counsel "repeatedly reject[ed] settlement offers for the maximum statutory damages available – all while [counsel] continued to accrue attorney's fees by this hollow, Damocles sword threats."

> The FDCPA was not passed in order to sprout a cottage industry for lawyers who self-servingly battle over attorney's fees in federal court. *See, e.g., Lee v. Thomas & Thomas,* 109 F.3d 302, 306-07 (6th Cir. 1997) ("Counsel should not wish to reap financial rewards for prolonging litigation unnecessarily.") And, in this Court's view, judicial economy is an appropriate consideration in addressing these repetitive, relatively minor fee disputes, especially as FDCPA filings rise and resources shrink.

Cohen v. American Credit Bureau, Inc., 2012 WL 847429 (D.N.J.)[5]

---

[5] See also Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA, 130 S.Ct. 1605, 1631-32, 176 L.Ed.2d 519 (U.S. 2010), in which Justices Anthony Kennedy and Samuel Alito, in a dissenting opinion, express similar concerns with the

"Notably, Congress included a fee award for prevailing parties in the FDCPA, like other consumer protection statutes, to encourage able counsel to undertake FDCPA cases; however, as the Sixth Circuit held in *Lee*, 'able counsel should aspire to achieve their client's objectives economically…and counsel should not expect to reap financial rewards for prolonging litigation unnecessarily.' 109 F.3d at 307. 'Defendants, like the courts, have an interest in peace; once there is no more dispute, there is no case. Both the parties and the court may save the cost of litigation." Murphy v. Equifax Check Service, Inc., 35 F.Supp.2d. 200, at 204. See also, Rand v. Monsanto Co., 926 F.2d 596, 598 (7th Cir. 1991) ("Once the Defendant offers to satisfy the Plaintiff's entire demand, there is no dispute over which to litigate ); Alliance to End Repression v. City of Chicago, 820 F.2d 873, 878 (7th Cir. 1987) (holding that a Plaintiff who is offered all of the relief he demands may not refuse the offer and then go to trial); Cresswell v. Prudential-

---

abusive practices of debtor's attorney's in seeking to collect exorbitant attorney's fees in prosecuting FDCPA claims.

> Today's holding gives new impetus to this already troubling dynamic of allowing certain actors in the system to spin even good-faith, technical violations of federal law into lucrative litigation, if not for themselves then for the attorneys who conceive of the suit. See *Federal Home Loan Mortgage Corp. v. Lamar,* 503 F.3d 504, 513 (C.A.6 2007) (referring to the "cottage industry" of litigation that has arisen out of the FDCPA (internal quotation marks omitted)).

Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA, 130 S.Ct. 1605 at 1631-32.

Bache Securities, Inc., 675 F. Supp. 106 (S.D.N.Y. 1987) (granting Defendant's motion to dismiss where Defendant tendered to Plaintiff all of his claimed damages plus pre-judgment interest, the full amount the Plaintiff could obtain if he were to prevail on the merits); Kuhne v. Law Offices of Timothy E. Baxter and Associates, P.C., 2009 U.S. Dist. LEXIS 53317 (E.D.Mich.) (denying a fee application in a FDCPA case where a majority of Plaintiff's counsel's time was expended after Defendant's offer of "maximum statutory recovery". "A reasonable fee is one that is adequately compensatory to attract competent counsel yet which avoids producing a windfall for lawyers.").

The District Court (Bryant, J.) failed to undertake any analysis or otherwise address the aforestated legal precedent relative to the unreasonableness of attorney's fees incurred by the Plaintiff subsequent to rejecting the Defendant's settlement offer. In so doing, the Court abused its discretion and committed reversible error.

Additionally, the District Court mistakenly held that Faulkner's conduct and tactics in rejecting the Defendant's settlement offers was not unreasonable because she "demonstrated a willingness to have the Court determine reasonable attorney's fees should the Defendant file an offer or stipulation of judgment throughout the course of the litigation." [A112] Judge Bryant found "[t]he availability of Rule 68 gives additional weight to this conclusion. As Faulkner repeatedly pointed out,

39

Defendant could have made a formal offer of judgment at the inception of this lawsuit thereby avoiding any liability for costs, including attorney's fee, incurred after the offer was made." [A113]

The District Court is correct that Defendant could have undertaken to file an offer or stipulation of judgment with the Court pursuant to Rule 68, which, in fact, the Defendant ultimately did. The legal fallacy in the lower Court's argument, however, is the Court's erroneous conclusion that the existence of said option was the "only" option available to Defendant, and that Plaintiff's rejection of a settlement offer at the inception of the litigation, via correspondence, for full statutory damages and a court hearing on fees was reasonable in light of the Rule 68 option.[6]

This argument, raised by Faulkner and relied upon by the District Court has been addressed and rejected by numerous Courts.  A settlement offer in a FDCPA case that provides the Plaintiff with full compensation for all damages, costs, and attorney's fees has the same effect as a Rule 68 Offer of Judgment for termination of attorney fees purposes. That is, the issue is whether a plaintiff has been offered full relief under the FDCPA, not *how* a plaintiff has been offered full relief.

---

[6]Faulkner e-mail, where Faulkner states that "the only way I can settle an FDCPA case is either a judgment plus fee application or a lump sum (say $4,500) and a withdrawal." [A46]

In <u>Murphy v. Equifax Check Service, Inc</u>., 35 F.Supp.2d. 200 (D.Conn. 1999), the settlement offer was communicated to Plaintiff's counsel by correspondence from Defendant's counsel ("defendant has offered to settle plaintiff's claims for $1,000 plus all reasonable fees and costs as determined by the Court….' Letter from defendant's counsel, David L. Hartsell, to plaintiff's counsel. Joanne S. Faulkner, dated October 6, 1998."). <u>See</u> <u>Automobile Ins. Co. of Hartford</u> <u>v. Electrolux Home Products, Inc.,</u> 2011 WL 3295510 (W.D.N.Y. Arcara, J.)

> The Court also is not persuaded by Hartford's contention that FRCP 68 is the only way in which plaintiff risks dismissal by rejecting a full settlement offer. *Kane* and cases like it are important because they involve dismissals following full settlement offers that were *not* made under FRCP 68.

<u>Automobile Ins. Co. of Hartford v. Electrolux Home Products, Inc.,</u> 2011 WL 3295510, at 3. <u>See also</u> <u>McCauley v. Trans Union, L.L.C.,</u> 402 F.3d 340, 341 (2d Cir. 2005)(rejecting an FRCP 68 offer but directing entry of default judgment for full damages because "a party [cannot] force his opponent to confess to having violated the law, as it is always open to a defendant to default and suffer judgment to be entered against him without his admitting anything … "[I]f the defendant has thus thrown in the towel there is nothing left for the district court to do except enter judgment."); <u>Cohen v. American Credit Bureau, Inc.,</u> 2012 WL 847429 (D.N.J.) (Where the Court limited attorneys fees in a FDCPA case to those incurred prior to

the offer of full relief conveyed in a correspondence, as opposed to a more formal offer under Rule 68); Kane v. U-Haul Int'l. Inc., 2005 WL 261935 (D.N.J.).

Further, as noted by the District Court, Faulkner's contention that there be an admission of liability in order for the plaintiff to be considered the "prevailing party" as a prerequisite to the Court's jurisdiction to award attorney's fees is incorrect, as "parties can contract to permit the recovery of attorney's fees under the American Rule." [A111] See U.S. Fidelity and Guar. Co. v. Braspetro Oil Servs. Co., 369 F.3d 34, 74 (2d Cir. 2004). As such, the Plaintiff's stated purpose for demanding a judgment, to have the Court maintain jurisdiction over this action for purposes of a Fee Application, is unsupported by law, further evidencing the unreasonableness of Faulkner's rejection of Defendant's settlement offer.

As such, based on the foregoing, the District Court erred in determining the subject attorney's fees were reasonable despite the fact that Defendant offered at the inception of the case to settle the FDCPA claim for full statutory damages plus a judicial determination of all costs and attorney's fees.

II.   THE DISTRICT COURT ERRED IN GRANTING PLAINTIFF'S APPLICATION FOR ATTORNEY'S FEES UNDER CIRCUMSTANCES WHERE THE FEES WERE NOT "REASONABLE" BASED ON PLAINTIFF'S COUNSEL'S TACTICS AND CONDUCT IN THE PROSECUTION OF THIS FEE-SHIFTING CASE.

The conduct and tactics of Plaintiff's counsel in her prosecution of this case, when viewed cumulatively, further undermine the reasonableness of the attorney's fees claimed by Plaintiff and further evidence that the continued prosecution of the FDCPA claim was not to vindicate the rights of the consumer Plaintiff, but rather, to generate attorney's fees for the sole benefit of counsel.

### A. **Faulkner was never retained by Cabala to represent his interests in the FDCPA matter; Faulkner did not have direct authority from, or an agreement with Plaintiff to act on his behalf under specific terms of representation, including the payment and collection of fees; Faulkner never communicated directly with Plaintiff and, in fact, was contractually prohibited from contacting Plaintiff by agreement with another attorney.**

The District Court erred in permitting Faulkner to receive an award of attorney's fees in connection with this matter insofar as the evidence belies a viable or lawful attorney-client relationship between Faulkner and Cabala that could support an award of attorney's fees in this action. Absent the direct authority from, and an agreement with, Plaintiff to act on his behalf under specific terms of representation, including terms relating to the payment and/or collection of the fees Faulkner is seeking to collect in this matter, Faulkner should be prohibited from receiving attorney's fees on Cabala's behalf in connection with a Fee Application.

In U.S. v. Int'l Bhd of Teamsters, 986 F.2d 15, 20 (2d Cir. 1993) this Circuit affirmed the proposition that the relationship between a lawyer and client is one of agent and principal and "actual authority may be inferred from words or conduct which the principal has reason to know indicates to the agent that he is to do the act." In DeVittorio v. Hall, No.07Civ.0812(WCC), 2007 WL 4372872, at *7 (S.D.N.Y. Dec. 12, 2007), the Court established factors to determine whether an attorney-client relationship exists: "(i) whether a fee arrangement was entered into or a fee paid; (2) whether a written contact or retainer agreement exists indicating that the attorney accepted representation; and (3) whether the purported client believes that the attorney was representing him and whether this belief is reasonable."

Connecticut state law's interpretation of whether an attorney-client relationship exists is similar to the factors used by courts in the Second Circuit. See Matthews v. Lynch, No.3:07CV739(WWE), 2009 WL 2407363, at *4 (D.Conn. Aug. 6, 2009) (noting that under Connecticut law an attorney-client relationship 'is established when the advice and assistance of the attorney is sought and received in matters pertinent to his profession' and 'Evidence of either a retainer agreement or a contract between the parties is relevant to the determination of the relationship's existence.') (quoting Distefano v. Milardo, 276 Conn. 416, 433 (2005); Solomon v. Aberman, 196 Conn. 359, 384 (1985).

Further, under the Rules of Professional Responsibility, the scope of representation and the basis of the fee <u>shall</u> be communicated to the client in writing.

> The scope of the representation, the basis or rate of the fee and expenses for which the client will be responsible, shall be communicated to the client, in writing, before or within a reasonable time after commencing representation…

<u>Rules of Professional Conduct – Rule 1.5 Fees</u>.

Based on this standard, Faulkner's relationship with Cabala belies an attorney-client relationship, which, in turn, undermines Faulkner's application for legal fees predicated on that relationship.

Moreover, during her testimony, Faulkner admitted that she did not have an agreement, in writing or orally, with Pinsky directly relating to her representation of Cabala. [A83-A84] Further, to the extent that Faulkner believed there was a generic oral agreement between her and Pinsky relating to her purported representation of his clients in FDCPA cases, by her own testimony, the agreement does not set forth the scope of representation, the hourly rate, the manner of compensation, the authority of Faulkner or any other material terms other than the fact that Faulkner is to have no communication with Pinsky's client and that Faulkner will be paid for her services by the Defendant. [A85-A86]

The case of <u>Menard v. Morris</u>, District of Connecticut, Civil Action No. 3:09-cv-1165(VLB), in which this same District Court (Bryant, U.S.D.J.) issued an order vacating a stipulated judgment and dismissing an FDCPA case which Faulkner commenced, prosecuted, and settled, where it was later determined that Faulkner was not lawfully engaged by the plaintiff, is particularly illustrative of Faulkner's conduct herein.

In <u>Menard</u>, the Court found, <u>inter alia</u>, the following facts: Faulkner did not communicate in person or otherwise directly with Menard prior to filing a FDCPA Complaint against Morris; Faulkner only spoke with Menard's sons during the course of the litigation; Faulkner never asked for or obtained a Power of Attorney from Menard's sons, nor did she seek or obtain any documentation from her sons which authorized either of them to speak or act on behalf of their mother; The first time Faulkner met with Menard or spoke with her personally was at her deposition, which was conducted in connection with Faulkner's Fee Application subsequent to the entry of a joint stipulation for judgment; Faulkner did not obtain from Menard any written acknowledgment regarding her representation in the action; Menard had never signed a retainer agreement in connection with Faulkner's services.[7]

---

[7] There were additional facts in <u>Menard</u> that distinguish the <u>Menard</u> from the <u>Cabala</u> case. At her deposition, Menard testified, among other things, that she was not aware she was a plaintiff in a lawsuit; she was not aware that she sued the

The <u>Menard</u> Court vacated the stipulated judgment and dismissed the action *ab initio* under Rule 60(d), finding that Faulkner did not have an attorney-client relationship with Menard. <u>See</u> <u>Menard v. Morris</u>, District of Connecticut, Civil Action No. 3:09-cv-1165(VLB), Document No. 87 dated March 15, 2012 (*Order Granting Defendant's Motion to Vacate Judgment and Dismissing the Action Ab Initio [DKT. #63]*).

In this case, as in <u>Menard</u>, there is no evidence of a lawful attorney-client relationship consistent with the legal standard set forth by the Second Circuit and the Connecticut courts. There is no letter of representation, no engagement letter, or any agreement establishing the terms and/or scope of representation relative to the FDCPA action. [A82-A83] There is no agreement and/or advisement or even a disclosure to Cabala relative to Faulkner's fees, hourly rate, or manner of compensation, or the way in which any fees might be collected or recovered. [A82-A83] Faulkner's advice and assistance was not sought by Cabala, and there are no words or conduct between Faulkner and Cabala that reflects the conveyance of actual authority by Cabala upon Faulkner to undertake legal representation on his behalf. In fact, to the contrary, Cabala and Faulkner never communicated directly regarding the FDCPA violation or the settlement offers made during the course of

---

defendant; she did not know who the defendant was; she did not know if Faulkner was representing her as an attorney; and that she did not know who Faulkner was.

the litigation, and pursuant to Faulkner's arrangement with Pinsky, Faulkner was expressly prohibited from any direct communication whatsoever with Cabala. [A86]

Under these circumstances, Faulkner should have been prohibited from recovering attorney's fees pursuant to her Fee Application insofar as there is insufficient evidence of a lawful attorney-client relationship, or the economic terms or scope of said representation sufficient to support an award of attorney's fees.

**B. <u>None of the settlement offers made by Defendant to Cabala were ever communicated by Faulkner to her purported client and Faulkner unilaterally rejected all offers. Additionally, the settlement offers made by Faulkner were made unilaterally, without consultation with, and the consent and knowledge of, Cabala.</u>**

The testimony of Cabala and Faulkner affirmed that Faulkner never consulted with Plaintiff with respect to settlement offers. [A72; A87; A91; A93-A95] She did not convey any of Defendant's settlement offers to the Plaintiff, despite having both a legal and ethical obligation to do so, and she proposed settlement offers on behalf of Plaintiff without his knowledge or consent. In essence, Faulkner went "rogue", denying and withholding material information from Cabala that undermined his right and ability to determine the purpose and objectives to be served by Faulkner's purported legal representation of his

interests, all the while undertaking legal action, the sole effect of which was to increase Faulkner's own economic stake in the litigation.

As a matter of law, an attorney does not have the authority to act for his client in making or rejecting settlement offers in a litigation. "An attorney has no right to settle his client's case … without express authority from his client. No such authority is implied in a mere retainer." <u>Preveden v. Hahn</u>, 36 F.Supp. 952, 953 (S.D.N.Y. 1941). <u>See also</u> <u>Rankin v. City of Niagara Falls</u>, 2012 WL 1565660 (W.D.N.Y.) ("[R]ooted in the law is the principle that, without a grant of authority from the client, an attorney cannot compromise or settle a claim. [citations omitted] 'The decision to settle is the client's to make, not the attorney's … The utter want of power of an attorney, by virtue of his general retainer only, to compromise his client's claim, cannot, we think, be successfully disputed.'" <u>quoting</u>, <u>Fennell v. TLB Kent Co.</u>, 865 F.2d 498, 502 (2d Cir. 1989).

Further, as a matter of law, settlement terms must be conveyed to and reviewed by an attorney with his client. <u>Abraham v. Volkswagen of America, Inc.</u>, 1991 WL 89917 (W.D.N.Y.,1991). <u>See also</u> <u>Miller v. Byrne</u>, 916 P.2d 566 (Colo.App. 1995) ("An attorney representing a client has an obligation to advise the client fully of settlement negotiations and their ramifications. *Rizzo v. Haines*, 520 Pa. 484, 555 A.2d 58 (1989); *Whiteaker v. State*, 382 N.W.2d 112 (Iowa 1986); *Joos v. Auto-Owners Ins. Co.*, 94 Mich.App. 419, 288 N.W.2d 443 (1979).

*See Kunz v. Warren*, 725 P.2d 794 (Colo.App.1986) (to discharge fiduciary duty to the principal, an agent must disclose all facts relevant to the subject matter of the agency which reasonably affect the decisions of the principal)…").

Most significantly, however, courts in this Circuit have held that an attorney's failure to convey a settlement offer to his client is egregious conduct that is inherently and self-evidently in "bad faith". In <u>Abraham v. Volkswagen of America, Inc</u>., 1991 WL 89917 (W.D.N.Y.,1991), defendant moved for sanctions against plaintiff's attorney for plaintiff's counsel's failure to advise his client of defendant's settlement offers and his unilateral rejection thereof. More specifically, in <u>Abraham</u>, defendant's counsel offered to settle plaintiff's litigation by correspondence to plaintiff's counsel. Twelve days later, plaintiff's counsel rejected the settlement offer without having conveyed it to his client. One and one half months later, plaintiff's counsel sent a letter to his client, "updating" them on the case. In that letter, plaintiff's counsel stated [Defendant] finally made an offer. Unfortunately, it was just another [Defendant] tactic." The Court granted Defendant's motion for sanctions.

> The client's exclusive authority to decide whether to accept or reject an offer of settlement is clear. N.Y.Jur. <u>EC 7–7</u>. An attorney's failure to inform his client that such an offer has been made necessarily denies the client of that right. "No type of misbehavior by an attorney is more universally and categorically condemned, and is therefore more inherently in "bad faith," than the failure to communicate offers of settlement." *Deadwyler v. Volkswagen of America, Inc.,* No. ST–

C–85–38, slip op. at 24 (W.D.N.C. Jan. 14, 1991); *see also* <u>*Rizzo v.*</u> <u>*Haines,* 555 A.2d 58, 66–67 (Pa.1989)</u> (failure to communicate settlement offers is among the few types of misconduct so self-evident that it is unnecessary to establish its improper character). In fact, even arguably less egregious conduct such as foot-dragging and delay in finalizing a settlement agreement has been sanctioned under <u>section 1927</u>. <u>*Forman v. Mount Sinai Medical Center,* 128 F.R.D. 591, 605–06 (S.D.N.Y.1989)</u>.

<u>Abraham v. Volkswagen of America, Inc</u>., 1991 WL 89917 (W.D.N.Y.1991).

Cabala's testimony established that he wanted to be consulted and believed Faulkner should have consulted him relative to settlement offers tendered by the Defendant. [A70] However, Cabala's and Faulkner's testimony established that Faulkner did not consult with Cabala concerning settlement offers. Further, Faulkner's testimony evidenced that she did not even convey settlement offers she made on Cabala's behalf, or settlement offers conveyed by Defendant to Pinsky. [A87; A91; A93-95]  Significantly, Cabala testified that he would have accepted a settlement offer that paid him the maximum statutory fee and attorney's fees and costs incurred, an offer that was rejected by Faulkner without consultation with Cabala or Pinsky. Faulkner did not even consult with her purported client with respect to an Offer of Judgment filed by Defendant in this matter.

Faulkner's conduct was inconsistent with Plaintiff's stated understanding of Faulkner's obligations to him, as well as Faulkner's obligations under the law.

The dichotomy between Cabala's testimony relative to his expectations regarding legal representation in this matter, and Faulkner's conduct as Cabala's purported counsel, underscores precisely why Faulkner was required to have a letter of representation setting forth the scope of representation and other material terms relative to her representation of Cabala. Absent an agreement governing the terms of representation, Faulkner was acting unilaterally, absent any consultation or input from Plaintiff. She further was acting in a manner contrary to her purported client's stated wishes and expectations, and in a manner either designed to, or having the effect of, increasing her personal stake in the litigation.

This conduct is further improper and undermines Faulkner's Fee Application insofar as, under the Rules of Professional Responsibility, a lawyer shall promptly inform a client of any decision or circumstances that would require a client's consent. Further an attorney shall reasonably consult with a client and keep a client reasonably informed of the status of the case, none of which occurred in this matter or could have occurred in this matter, since Faulkner agreed with Pinsky that she would never communicate directly with the person she was purporting to represent.

Pursuant to Rule 1.4 of the Connecticut Professional Rules of Conduct:

"A lawyer shall: (1) promptly inform the client of any decision or circumstances with respect to which the client's informed consent, as defined in Rule 1.0 (f), is required by these Rules; (2) reasonably consult with the client about the means by which the client's

objectives are to accomplished; (3) keep the client reasonably informed about the status of the matter."

Rule of Professional Responsibility 1.4.

"Subsection (a) confers upon the client the ultimate authority to determine the purposes to be served by legal representation, within the limits imposed by law and the lawyer's professional obligations. The decisions specified in subsection (a), such as whether to settle a civil matter, must also be made by the client. See Rule 1.4 (a) (1) for the lawyer's duty to communicate with the client about such decisions." (emphasis added) Connecticut Rules of Professional Conduct – Official Commentary to Rule 1.2.

By her own admission, Faulkner violated the governing law of this Circuit and the Rules of Professional Conduct. As a matter of law, her conduct was in bad faith.  In light of the foregoing, Faulkner simply should not have been permitted to recover legal fees in this matter pursuant to a Fee Application and the District Court erred in holding that said fees were reasonable in light of Faulkner's improper conduct.

C. **Faulkner testified that her clients do not have the sole exclusive right to accept or reject settlement offers, but that she, as counsel in a fee-shifting case, enjoyed and shared that right, jointly with her clients, since any settlement funds were to be paid to her, as legal fees.**

By her own admission, Faulkner failed to convey settlement offers and unilaterally rejected settlement offers [A87] under the improper and unlawful misapprehension that she and her client "collectively" had the authority to settle this case. [A80-A81]

In actuality, however, Faulkner's testimony revealed and her actions reflected that she believed she had the "unilateral" right to settle this case, as the primary recovery was for her attorney's fees. [A80-A81] Her failure to even convey to Cabala, let alone collaborate with Cabala, as to a single settlement offer made by Defendant, or a single offer made by Faulkner, does not reflect a collaborative settlement effort; it reflects a unilateral effort by counsel, to the complete exclusion of the client.

As stated in subsection II(b), supra, "[t]he decision to settle is the client's to make, not the attorney's." Fennell v. TLB Kent Co., 865 F.2d 498, 502 (2d Cir. 1989). Whether Faulkner's conduct is "unilateral" as reflected in her actions, or "collaborative" as reflected in her testimony, her conduct and tactics in prosecuting this fee-shifting FDCPA case is unlawful and improper.

Further, pursuant to Faulkner's testimony, if her attorney's fees are $10,000.00, and there is a $5,000.00 settlement offer made and accepted, she receives the entirety of the $5,000.00 settlement sum for legal fees. [A80-A81] This is hardly a scenario that "confers upon the client the ultimate authority to determine the purposes to be served by legal representation". Connecticut Rules of Professional Conduct – Official Commentary to Rule 1.2. This testimony further underscores how, through her tactics, Faulkner claims to obtain a proprietary interest in a FDCPA claim in a manner that conflicts with the interest of her clients, contrary to common law champerty and maintenance, further undermining the reasonableness of her claimed fees.

As held by the Connecticut Supreme Court in the case of Ankerman v. Mancuso, 271 Conn. 772, 778-788, 60 A.2d 244, 247-48 (2004), an attorney is prohibited from obtaining an economic interest in an action such that the client's interest is undermined by the attorney's own economic interest.

> A lawyer shall not acquire a proprietary interest in the cause of action or subject matter of litigation the lawyer is conducting for a client, except that the lawyer may: (1) Acquire a lien granted by law to secure the lawyer's fee or expenses; and (2) Contract with a client for a reasonable contingent fee in a civil case." Rule 1.8(j) 'states the traditional general rule that lawyers are prohibited from acquiring a proprietary interest in litigation. This general rule...has its basis in common law champerty and maintenance....' Rules of Professional Conduct 1.8, commentary. 'Champerty is simply a specialized form of maintenance in which the person assisting another's litigation becomes an interested investor because of a promise by the assisted person to

repay the investor with a share of any recovery.' C. Wolfram, Modern Legal Ethics (1986) § 8.13, p. 490; see also *Richardson v. Rowland,* 40 Conn. 565, 570 (1873). Rule 1.8 is intended to avoid conflicts of interest between attorneys and clients. Specifically, the rule addresses the concern that 'the lawyer will not seek and accept client guidance on major decisions in the lawsuit because of the lawyer's own economic interest in the outcome.' C. Wolfram, supra, 492."

Ankerman v. Mancuso, 271 Conn. 772, 778-78860 A.2d 244, 247-48 (2004).

By purporting to maintain a proprietary interest in the action as reflected in her testimony, Faulkner virtually admits that she has 'not sought or accepted client guidance on major decisions in the lawsuit because of her own economic interest in the outcome of the case.' Faulkner created a scope of representation with Cabala whereby she did not communicate with him, did not have a letter of engagement with him, did not advise him of the status of the case or any developments, did not consult with him relative to settlement offers, and where she maintained complete control over the terms of settlement while maintaining a substantial economic interest in the litigation well beyond that of the actual Plaintiff. Further, her personal economic stake in this action is manifested and realized in continued extensive litigation resulting in increasing legal fees. Under these circumstances, the FDCPA claim was being prosecuted for the incurrence and collection of additional legal fees. The fees incurred under these circumstances were unreasonable, and the District Court abused its discretion in granting Faulkner's Fee Application.

**D. Plaintiff's tactics in threatening Defendant with the fact that the FDCPA was a fee shifting statute, while refusing to identify the attorney's fees then incurred for purposes of settlement was unreasonable. Further, Plaintiff's settlement demands during the course of litigation, purporting to reflect the amount of legal fees then incurred by Plaintiff's counsel, admittedly were inflated at the time provided.**

Faulkner's tactic in continually threatening Defendant with the fact that the FDCPA is a fee shifting statute and that her fees were constantly increasing, while simultaneously withholding and refusing to identify the increasing fees she was demanding Defendant blindly pay, should not be judicially sanctioned as proper or reasonable conduct in the context of an action under the FDCPA in the context of an Application for Attorney's Fees. [A33; A45-A56]

Additionally, the amount of attorney's fees demanded by Faulkner over the course of this litigation to settle this matter was inflated at the time of Faulkner's demands in relation to the actual fees incurred at the corresponding point in time of the litigation. [A89; A90; A110; A102] Thus, Defendant's worst fears over the course of this litigation were realized – Defendant offered repeatedly to settle this case for full statutory damages plus a Court hearing to determine the reasonableness of Faulkner's fees, which was continually rejected; [A33; A45-A56] Defendant requested that Faulkner identify the amount and basis of her legal fees for the purposes of settlement, which Faulkner refused to do. [A33; A45-A56] Plaintiff countered Defendant's offers with what appeared to be inflated demands

to settle this matter, while refusing to provide any back-up documentation in support of those demands; and Defendant was left with little choice other than to pay Plaintiff's demanded fees in a vacuum, or to defend the matter in the context of what Plaintiff's counsel repeatedly warned was a fee shifting case.

Faulkner's conduct and tactics, when viewed cumulatively, undermines the reasonableness of the attorney's fees claimed by Plaintiff and evidences that the continued prosecution of this matter was undertaken not to vindicate the rights of the Plaintiff consumer, but to generate attorney's fees for the benefit of counsel.

## CONCLUSION

For the reasons set forth herein, the Defendant respectfully requests that this Court reverse the District Court's August 24, 2012 Decision granting Plaintiff's Fee Application.

Dated: January 22, 2013                    Respectfully submitted,


BY:   _/s/ David W. Rubin_____
      David W. Rubin, Esq. (ct-10169)
      Andrew J. Soltes, Jr., Esq. (ct-26963)
      Law Offices of David W. Rubin
      600 Summer Street, Suite 201
      Stamford, CT 06901
      Telephone: (203) 353-1404
      Facsimile:   (203) 357-7208
      E-mail: drubin@dwr-law.com
      Attorney for Defendants

# CERTIFICATE OF COMPLIANCE

1.      This brief complies with Fed. R. App. P. 32(a)(7)(b) Which requires that the principal brief contains no more that 14,000 words.

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Tines New Roman font.


Dated:  Stamford, Connecticut
            Dated January 22, 2013

                                        Respectfully submitted,


                              BY:    /s/ David W. Rubin
                                        David W. Rubin, Esq. (ct-10169)
                                        Law Offices of David W. Rubin
                                        600 Summer Street, Suite 201
                                        Stamford, CT 06901
                                        Telephone: (203) 353-1404
                                        Facsimile:   (203) 357-7208
                                        E-mail: drubin@dwr-law.com
                                        Attorney for Defendants